UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

**In re:**

| | |
|---|---|
| **All-City Towing LLC,** | **Case No.: 26-20523** |
| **Bret's Towing LLC,** | **Case No.: 26-20524** |
| **ACT RE LLC,** | **Case No.: 26-20525** |
| **Bret's RE LLC,** | **Case No.: 26-20526** |
| **OMS Properties LLC,** | **Case No.: 26-20527** |
| **5408 S 13th LLC,** | **Case No.: 26-20528** |
| **5414 S 13th LLC,** | **Case No.: 26-20529** |
| **Daddy Jeff LLC,** | **Case No.: 26-20530** |
| **Mactire Services LLC,** | **Case No.: 26-20531** |
| **Jeffrey Piller and Candice Brecht,** | **Case No.: 26-20532** |
| Debtors. | **Chapter 11 Proceedings** (Motion for Joint Administration Pending) |

### DECLARATION OF JEFFREY J. PILLER IN SUPPORT OF
### THE DEBTORS' FIRST DAY MOTIONS

I, Jeffrey J. Piller, declare under 28 U.S.C. § 1746 that the following is true to the best of my knowledge, information and belief:

**Foundational Background**

1. I have personal knowledge of all facts set forth in this declaration. If I were called upon to testify, I could and would testify competently to these facts.

2. I am the sole member and manager All-City Towing LLC ("All-City"), Bret's Towing LLC ("Bret's Towing"), ACT RE LLC ("ACT RE"), Bret's RE LLC ("Bret's RE"), OMS Properties LLC ("OMS Properties"), 5408 S 13th LLC ("5408 LLC"), 5414 S 13th LLC ("5414 LLC"), Daddy Jeff LLC and Mactire Services LLC ("Mactire") (collectively, the "Corporate

Debtors"; Corporate Debtors together with myself and my spouse, Candice Brecht, collectively, the "Debtors").

3. The Corporate Debtors operate auto repair, towing, and transportation businesses. In 2024, the Corporate Debtors' gross revenue on a consolidated basis was approximately $11.5 million.[1]

4. All-City's auto repair, towing, and transportation businesses operate out of two locations. The main office is located at 1213 Mallory Avenue, Milwaukee; OMS Properties owns the real property. All-City's second location is at 2073 County Road W, Grafton; ACT RE owns the real property.

5. Bret's Towing's auto repair, towing, and transportation businesses operate out of 2233 S. Business Drive, Sheboygan. Bret's Towing also has an impound/storage lot located at 1181 Marin Avenue, Sheboygan. Bret's RE owns both parcels of real property that Bret's Towing uses.

6. In addition to the auto repair, towing, and transportation businesses operated by All-City and Bret's Towing, I own 5408 LLC, 5414 LLC and Daddy Jeff LLC. They own residential properties that are adjacent to the business locations of All-City and Bret's Towing. I purchased the residential properties through these LLCs to avoid difficulties with neighbors that owned the properties.

7. I formed Mactire at the suggestion of my accountant to act as a real property management company. Mactire obtains insurance, interacts with tenants and provides some other real estate management functions. However, it has never fully operated as a management company.

---

[1] Note from Kerkman & Dunn ("K&D"): all amounts are rounded for the ease of reading. Exact amounts are not material for the purposes of this declaration.

## Background on Business Operations and Growth

8. I have been the owner and operator of an auto repair and towing business since 2011. Before buying All-City, I worked for my father in his auto repair business. The owner of All-City parked his single tow-truck behind my father's store. When the owner passed away, I purchased the tow-truck and phone number for $45,000. At the time, All-City had about a dozen customers.

9. After buying All-City, I started growing the business. In the next two or three years, All-City acquired a competitor that did car hauling or transportation – Auto Haulers – to expand its operations. At that time, All-City had around 15 employees.

10. In the next year, I purchased Tim's Towing which increased All-City's fleet by five trucks and grew the business by another dozen employees. At about the same time, All-City began doing work for the City of Cudahy Police Department.

11. By the end of 2018 or start of 2019, the business was doing very well, and I wanted to continue to grow the business. I worked with an investment banker to develop a five-year strategy and obtain favorable financing through the United States Small Business Association ("SBA").

12. The financing significantly increased the business's debt service payments. The business had gross annual revenue of approximately $3 million at that time.

13. Prior to the Covid-19 pandemic, All-City's business was very good and had added contracts with the City of Milwaukee Police Department.

14. All-City struggled because of the shutdown during the pandemic. All-City was still required to maintain the same staff to perform under its government contracts; however, fewer people were driving, so revenue from the auto-repair and towing business was down.

15. All-City obtained a grant under the Payroll Protection Program ("PPP") from the SBA but still struggled financially. I was concerned that All-City would go out of business.

16. About nine to twelve months into pandemic the used car markets became very strong. All-City's transportation business was able to support operations. All-City ultimately purchased two additional vehicles to keep up with the transportation work. During this time, I was able to save funds in the bank.

17. After the pandemic, I was reenergized, and business was good again. I was ready to continue to expand and increase profitability by buying other businesses.

18. In July 2023, I formed Bret's Towing to buy Bret's Towing and Auto Repair business located in Sheboygan. I acquired the name, seven vehicles, equipment, tools, business operations, and real estate including an impound storage facility. Bret's RE was formed to hold the purchased real estate. After the purchase, All-City had about 50 employees.

19. The purchase of Bret's Towing increased revenue by approximately $1.3 million in the first year. It widened the Debtors' business area by expanding the freeway mileage covered.

20. In January 2024, I had the opportunity to acquire another business – Lanser Towing. Ultimately, the seller opted not to sell the name, equipment or property. I purchased the good will and customer list. Separately, I purchased three trucks and real estate. It was through the latter purchase that the Debtors acquired the Grafton property owned by ACT RE.

21. It was about this time that I realized the increased need for additional management. I could not run the business by myself anymore. I attended free seminars to learn management processes and built 100 standard-operating procedures. As a result, the business now has a very structured management team and employs approximately 85 employees.

**Financial Distress**

22. In January 2025, I hired a different investment banker to develop an updated five-year plan to increase profitability. The firm was Madison Street Capital. I hoped to obtain favorable financing for the Debtors like I had previously done.

23. At the time, the Debtors owed approximately $700,000 on a loan with the SBA. The loan was secured by essentially all the Debtors' assets. The investment banker advised that a commercial lender was willing to provide financing to the Debtors of approximately $8 to $10 million. The financing would be in $2 million stages or tranches over a period of two to three years as I continued to expand the business.

24. The investment banker advised me that to obtain the financing the Debtors would need to remove the SBA loan. The investment banker recommended short-term bridge loans through three merchant cash advance ("MCA") lenders totaling $1 million. From the $1 million, I was to pay $700,000 to satisfy the SBA loan and retain $300,000 to make monthly payments to the MCA lenders until the closing of a permanent loan from a commercial lender. The investment banker advised me that the permanent loan would wrap up in three to four weeks.

25. I expressed hesitation over the approach and was reassured by the investment banker. He told me that it was regular approach and said along the lines, "we do this all the time. We are professionals. I would never put you into something that we can't get you out of. It's going to be expensive, but it's going to be worth it."

26. Within a week of closing on the financing with the MCA lenders and paying off the SBA loan, the investment banker informed me that the commercial lender had pulled out of the deal. I was shocked and could not pay off the MCA lenders. My investment banker said it was

a small hiccup and not a big deal. After two weeks, the investment banker stopped returning my calls and I was left adrift.

27. In May 2025, I worked with Michael Covino of Covino Family Office ("Covino") to obtain financing. Through Covino, the Debtors were approved for a new loan with Newtek Business Services Holdco 6, Inc. ("Newtek"). (The businesses previously had one.) The Newtek loan is secured by liens against the personal property of All-City, Bret's Towing, and OMS Properties as well as the real estate held by other Debtors.[2]

28. The Newtek loan closed September 30, 2025, and the proceeds were used to pay all but one of the MCA loans from earlier in the year and the existing Newtek loan. There were not enough proceeds to pay off QFS. However, Covino arranged an additional $800,000 loan from Parkside to pay off the remaining MCA loan to QFS.

29. Covino said that the Parkside loan and all the Debtors' financings for equipment and vehicles would be refinanced within 30 days under an SBA 7A loan.

30. The day after closing on the new Newtek loan marked the beginning of the longest shutdown of the federal government that continued until November 12, 2025. The shutdown included the SBA and meant that the Debtors could not obtain the SBA 7A loan as planned.

31. As the shutdown continued, Covino stopped communicating with me. After four weeks, the Debtors obtained new MCA financing from AFK Inc. a/k/a ("Fundkite") to buy out Parkside and reduce the weekly payment.

32. The Debtor took three more loans from MCA lenders to finance operations and make payments to lenders. All were with the expectation that the Debtors would be able to

---

[2] From Kerkman & Dunn's review of documents, it appears that Newtek and NBL SPV II LLC are related as either assignor/assignee or one services the debt for the other. Until Kerkman & Dunn has sufficient information to determine the relationship, the pleadings refer to Newtek but notices are being provided to both Newtek and NBL.

refinance with the SBA once the government worked through the shutdown and operations returned to normal.

33. After the shutdown ended, the Debtors applied for the financing with the SBA. On or about December 29, 2025, the SBA denied the Debtors' application. Since I was out of options, I explored reorganization through chapter 11 bankruptcy.

## Immediate Cash Requirements

34. The Debtors' immediate cash needs are shown on the budget attached to my declaration as Exhibit 1.[3]

35. The Debtors must pay employees. They must pay for gas. The Debtors receive monthly gross revenue of approximately $1 million. Revenue is consistent, but payment terms vary based on the type of account. Government contracts generally pay within 30 days. Dealers vary between 0 to 30 days. Auctions pay 7 to 30 days. Private customers pay within 0 days – upon pick up.

36. All-City and Bret's Towing need cash to pay their employees: the mechanics that provide maintenance and servicing and drivers. Funds are drawn from All-City's payroll account every Wednesday by 4:00 p.m. to meet the payroll that employees receive the next day, on Thursday.

37. The other Debtors also need cash to operate but do not have the urgency to meet immediate cash needs. All the Debtors will need cash to operate their businesses in the next two weeks so that the businesses can continue to operate. Without cash to purchase supplies, fuel for hauling and towing customers, parts to repair vehicles and equipment, and the host of other

---

[3] K&D note: all exhibits are being filed as attachments to this declaration and the declaration of Evan Schmit filed with this declaration.

essential expenses, the businesses will likely fail and will not be able to restart. The damage to the businesses would be irreparable. Employees would look for work elsewhere and customers would lose faith and take their business elsewhere. The amounts needed by the Debtors to pay necessary expenses to avoid the businesses shutting down or being irreparable harmed are listed on the budget marked as Exhibit 1.

## Description of Assets and Secured Creditors

38. Attached as Exhibit 2 is a "Cash Collateral Analysis." It was prepared by Kerkman & Dunn and me. I reviewed the final version that is attached and approve it as the best estimate of values and debts as of February 1. Because the books have not been closed, this is not final but based upon the best information presently available to me. It is my best estimate of the values of that could be realized for the Debtors' assets if they were liquidated. The following is an explanation of how I arrived at the values provided:

    (a) **Current Assets/Cash Collateral.** I started by reviewing the balance sheets for All-City and Bret's Towing as of December 29, 2025. I excluded employee receivables, and miscellaneous current assets, such as prepaid debts and employee receivables and advances. I do not believe any material amount could be obtained if they were liquidated. The assets that I believe have material values are listed on Exhibit 2.

        (i) The Checking/Savings Account amounts are what the banks show via my online access to the accounts as balances as of January 31, 2026, or the Debtors' financial records show. Undeposited checks are checks received but not yet deposited into the Debtors' accounts. For purposes of Fair Market Value, I valued these at 100% of the actual amounts.

(ii) The book values for the Accounts Receivable are taken from the Debtors' financial records as of January 30, 2026. I valued the receivables for invoices issued less than 90 days ago at 90% for both All-City and Bret's Towing. The other Debtors have no accounts receivable except perhaps rents due from tenants, which are not material amounts; all monthly rents are less than $2,000 per month. As for the accounts receivable for invoices issued more than 90 days ago, I valued them at 50% for All-City and 75% for Bret's Towing. All-City's 90+ days receivables are from many small customers that have not paid for various reasons. Bret's Towing has one receivable from a governmental agency that is delayed but will be paid.

(b) **Fixed Assets.** I started by reviewing the balance sheets for All-City and Bret's Towing as of December 29, 2025. The only fixed assets that I believe have any value are EIDL Assets, computers, machinery & equipment and shop equipment. The EIDL Assets as machinery & equipment. The accountant gave it that description to reflect assets that were purchased with proceeds from the EIDL loan. There is no asset to be sold so it is not included. I also did not include land, depreciation or amortization costs. The last two are book entries that do not have any value that can be sold. The land value is included in my estimated value of real estate described below.

(i) Book value for computers is their cost. If they were liquidated, I don't think much would be realized. I valued them at 10% of book value.

9

(ii) The book values listed for machinery & equipment are $8,277,868.43 and $357,932 minus accumulated depreciation. I allocated all the depreciation on the books to the equipment. The depreciation may relate to other assets, but the allocation is relatively minor and not material, so I did not break it out. Then, I reviewed each piece of equipment, which consisted of vehicles, and determined my best estimate of values if they were sold without distress. I did not break them out by Debtor company, so they are all included in All-City's assets because All-City owns the greatest value of them by far. I estimated that the total gross value of the vehicles was $6,681,000. I then deducted the total amount currently owed to lenders that provided financing to purchase the vehicles and have liens against them of $3,373,213, resulting in net equity of approximately $3.3 million. The valuation includes the EIDL Assets. In a liquidation scenario, I do not believe that the vehicles would be sold for my estimated value. I reduced the value by one-third, resulting in an estimated value at liquidation of $2.2 million.

(iii) The book values for shop equipment and tools are their costs without depreciation considered. If they were liquidated, I estimate 50% of cost/book value would be realized.

(c) **Real Estate.** I determined the estimated values of the real estate owned by the Debtors. I considered the purchase price, the latest fair market values stated on the real estate tax bills, my knowledge of sales of real estate near

10

the locations and discussion of values with Newtek Business Services when it provided financing in the fall of 2025. The values provided on Exhibit 2 are my best estimates of values for real estate.

(d) **Liabilities.** The liability amounts stated on Exhibit 2 are based upon the Debtors' financial records or invoices received from the creditors.

39. I believe the information summarized on Exhibit 2 accurately reflects the information stated relevant to the debts of the Debtors in the chapter 11 cases. I believe that the only creditors with liens against which there is equity in assets for the liens to attach are the creditors that financed equipment, creditors with first position mortgages against real estate, and Newtek Business Services. As for Newtek Business Services, I believe there is only $5.55 million in assets to secure its claim of approximately $5.1 million. The value of its collateral is approximately $450,000 more than the amount of its debt so some of the SBA EIDL loan would be secured. There does not appear to be enough equity in the assets that are collateral to secure Old National Bank's debt, but it is being included in the analysis because of assets are close to fully securing Newtek and the SBA that it may be possible for assets to be available as collateral for the Old National Bank debt.

40. The most recent balance sheets from end of 2025 for All-City and Bret's Towing are attached as Exhibits 3 and 4, respectively.

41. The most recent income statements from for the year ending December 31, 2025 for All-City and Bret's Towing are attached as Exhibits 5 and 6, respectively.

## Status of Business Operations

42. Without the payments to the MCA lenders, the Debtors collectively will operate at a profit. Below is a summary of the payment obligations to MCA lenders as of January 31, 2026.

11

The Debtors' collective gross revenue is approximately $1 million per month. The Debtors were paying nearly 50% of that to the MCA lenders:

| MCA Financing | | | |
|---|---|---|---|
| MCA | Withdrawal Frequency | Amount Withdrawn | Estimated Balance |
| NewCo | Weekly | $ 18,515 | $ 447,444 |
| Panther | Weekly | $ 28,000 | $ 672,000 |
| Arum #2 | Weekly | $ 19,853 | $ 472,509 |
| FundKite | Weekly | $ 4,560 | $ 127,673 |
| FundKite | Weekly | $ 31,025 | $ 915,238 |
| | | | |
| **Total - Weekly** | | **$ 101,953** | |
| | | | |
| TVT Loan | Monthly | $ 51,345 | $ 608,750 |
| **Total - Monthly** | | **$ 459,158** | |
| **Total Balance** | | | **$ 2,634,864** |

### Pre-Petition Compensation

43. All-City pays employees primarily through automated transactions deposited directly into their personal bank accounts. Two employees are issued paychecks. The Debtors withhold the employee portion of all federal and state withholding taxes, employer's share of federal, state and local taxes, and deduct any voluntary and non-voluntary deductions, including benefits, child support, and garnishment before remitting the balance of any wages or salary to the employees.

44. The Debtors' payroll is weekly, from Monday through Sunday. Employees are paid one week in arrears. The most recent payroll period ends on Sunday, February 1, 2026, and began on Monday, January 26. The payroll for the week ending February 1 will be submitted on Tuesday, February 3. Funds will be drawn on Wednesday, February 4 and employees will receive payment on Thursday, February 5. This requires that the payroll account has good funds available on Wednesday, February 4, to fund the payroll. The payroll that employees will receive on

Thursday, February 5, will all be earned before the voluntary chapter 11 petition is filed on February 1.

45. The weekly payroll cost totals approximately $94,000 and includes $2,308 for myself and $1,924 for my spouse, Candice Brecht. I am the CEO. I supervise and oversee the Debtors' operations. I work between 55 to 60 hours per week. Candice is the CEFO. She manages the finances and pays expenses for the Debtors. She works between 35 to 40 hours per week.

46. In addition to the weekly payroll, the Debtors pay benefits. The benefits are paid in advance. Nothing is due for benefits accrued before February 1.

47. Until the chapter 11 filings, the Debtors were current with all their payroll obligations, including related taxes.

48. The amount sought to be paid to any one employee for all compensation earned before February 1, 2026, will not exceed $17,150.

49. The Debtors' payroll account is at Associated Bank. Funds are transferred into the payroll account from the operational account which is also with Associated Bank. Any disruption to the Debtors' access of these accounts would prevent them from timely making payment.

50. If employees are not paid timely, it will disrupt the Debtors' businesses and sow mistrust among employees that the Debtors need. The value of the Debtors depends upon their ability to continue as going concerns, including the maintenance of their workforce. Without continuing payments to the Debtors' employees, it is unlikely that the workforce would remain in the Debtors' service, and even if any workforce remained, it is unlikely that they would be highly motivated to provide quality service. Likely, employees would immediately leave the Debtors' service. Without their existing workforce, the Debtors would be unable to service their customers and the damage to the Debtors would be irreparable. There are no practical or legal alternatives to

retention of the employees. As a result, the Debtors need to use the payment of compensation earned before the chapter 11 filing to garner services after the filing from their workforce. Not doing so would substantially jeopardize the value of the businesses.

51.    The payroll summary with the estimated amount for the upcoming payroll is attached as Exhibit 7. It may vary slightly once payroll is finalized.

52.    The Debtors anticipate that they will have access to sufficient funds on hand, from their business operations to pay all compensation earned before the chapter 11 filings as it becomes due in the ordinary course of the Debtors' businesses.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.**

Dated: February 1, 2026.

                                          */s/ Jeffrey J. Piller*
                                          Jeffrey J. Piller

<u>Drafted by</u>:

Evan P. Schmit
Kerkman & Dunn
839 N. Jefferson St., Suite 400
Milwaukee, WI 53202-3744
Phone: 414.277.8200
Facsimile: 414.277.0100
Email: eschmit@kerkmandunn.com

retention of the employees. As a result, the Debtors need to use the payment of compensation earned before the chapter 11 filing to garner services after the filing from their workforce. Not doing so would substantially jeopardize the value of the businesses.

51. The payroll summary with the estimated amount for the upcoming payroll is attached as Exhibit 7. It may vary slightly once payroll is finalized.

52. The Debtors anticipate that they will have access to sufficient funds on hand, from their business operations to pay all compensation earned before the chapter 11 filings as it becomes due in the ordinary course of the Debtors' businesses.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.**

Dated: February 1, 2026.

/s/ Jeffrey J. Piller
Jeffrey J. Piller

<u>Drafted by:</u>

Evan P. Schmit
Kerkman & Dunn
839 N. Jefferson St., Suite 400
Milwaukee, WI 53202-3744
Phone: 414.277.8200
Facsimile: 414.277.0100
Email: eschmit@kerkmandunn.com